Robert Alfred Archibald WILLENS, Appellant,

v.

Alvin Leonard BREEN and Martin Victor Sussman, Appellees.

Patent Appeal No. 7349.

United States Court of Customs and Patent Appeals.

April 15, 1965.

Leonard Horn, Margate City, N. J., for appellant.

A. Newton Huff, Wilmington, Del. (Norris E. Ruckman, Wilmington, Del., Frederick Schafer, Washington, D. C., of counsel), for appellee.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to Alvin Leonard Breen and Martin Victor Sussman, the junior party, in interference No. 91,290. Breen and Sussman are involved in the interference on the basis of their application serial No. 810,671, filed May 4, 1959, which application is designated a continuation-in-part of serial No. 598,-135, filed July 16, 1956. The senior party Willens is involved on the basis of his patent No. 2,890,568, granted June 16, 1959 on an application filed June 4, 1957.

Willens relies for priority solely on a British provisional application, serial No. 18,941, filed on June 19, 1956, and took no testimony. Breen and Sussman took testimony and filed related exhibits, pur-

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

porting to show actual reduction to practice on two occasions, both prior to the June 1956 date relied upon by Willens. The board held that reduction to practice had not been proved on the first of those occasions, January 27, 1956, but based the award of priority on a holding that Breen and Sussman did establish by a preponderance of the evidence [1] that the invention was actually reduced to practice on April 23, 1956.

The subject matter of the interference is a method for producing a voluminous or bulky yarn, which method is particularly applicable to imparting a twisted or three dimensional configuration to straight continuous filaments of thermoplastic material. In issue is a single count corresponding to claim 1 of the Willens patent, reading: [2]

"(a) A method of producing a voluminous yarn, said method comprising

"(b) drawing a yarn from a source of supply at one linear speed,

"(c) forwarding the yarn at a higher linear speed,

"(d) to a zone in which false-twist is imparted to said yarn,

"(e) so as to stretch said yarn immediately before it enters said zone,

"(f) setting in the fibers of the yarn the distortion imposed by said false-twist,

"(g) withdrawing the yarn from said zone,

"(h) and collecting it at a linear speed less than that at which it was fed into said zone."

Before us, Breen and Sussman again urge they proved reduction to practice on January 27, 1956 as well as on April 23, 1956. Willens' position is that they did not prove reduction to practice on either occasion.

The evidence includes testimony of Sussman, Breen, Wetzel and Walston, all employees of the du Pont Company at the time in question, and documentary exhibits including selected pages of notebooks kept by Sussman and Walston. Sussman and Breen were trained chemists doing research work on textile fibers and Wetzel and Walston were technicians working in the same Laboratory and supervised by Sussman and Breen, respectively.

Exhibits 1 and 2 constitute three pages selected from a notebook kept by Sussman. Those pages which relate to the activity on January 27, 1956, were signed by Sussman and Wetzel and discussed in their testimony. Concerning the evidence of that activity, the board stated (record citations omitted):

"We believe that the testimony of Wetzel, corroborating the testimony of Breen and Sussman, clearly establishes that on January 27, 1956, Sussman and Wetzel together operated a conventional cold drawing machine modified by the addition by Wetzel of a radiant heater and a jet twister in a manner to perform all of the steps set forth in the count in issue. Wetzel testified that he secured the radiant heater and jet twister and installed them on the conventional drawing machine, describing the relationship of the parts, and that the machine so modified was run that same day, January 27, 1956. Wetzel referred to both of the photographs of the actual machine noted above, and to the sketches appearing in exhibits 1 and 2, and described the operation of the various components of the machine illustrated therein. He stated that the yarn used in the operation was undrawn nylon; he related the speed of the identified draw rolls in terms of yards per minute (surface speed), the draw ratio (3.8) indicating the amount that the nylon yarn was cold

1. The board noted that the Breen and Sussman application was copending with the Willens patent and that the burden of proof on Breen and Sussman therefore is by a preponderance of the evidence, as contrasted with proof beyond a reasonable doubt. See Seeley v. Rennick, 314 F.2d 577, 50 CCPA 1214.

2. The count is shown broken down into its component recitations as reproduced in Willens' brief, the letters (a)–(h) not appearing in the count itself.

drawn between the feed rolls from the source of supply and the draw rolls (the feed rolls being operated at a slower speed than the draw roll; he indicated that the heater maintained a temperature of 350°C to set the distortion in the fibers of the yarn and that the jet twister maintained a false twist in the yarn in the zone where the heater was located. Wetzel was questioned and cross-questioned at length with respect to the take-up of the yarn and its appearance. He stated that the yarn travelled from the heater and jet twister downstream 'to a take-up roll or pirn.' He said that the 'take-up roll' travels slower than the way the yarn is fed to it and therefore that the yarn

> " 'is in a bulky sort of state and is fed onto a pirn or whatever you may have there to package it.'

In this operation a pirn was used to package the yarn; there were no take-up rolls as such present * *."

The board specifically concluded "that the evidence fairly establishes that every step set forth in the count was performed and that an unknown quantity of bulky or voluminous yarn was produced on January 27, 1956." However, it held that reduction to practice has not been proved, finding there was no positive indication that as of that date the yarn was regarded as a satisfactory yarn. In that connection, it noted testimony by Breen that, when a pirn take-up is used without positive take-up rolls, as it was on that occasion, a variable tension would be imposed on the thread line in the twisting zone and that "this might cause some variation of bulkiness or voluminous character of the yarn which, * *, would be unacceptable from the standpoint of a commercial product." The board further observed that Sussman stated on Exhibit 1 that the product showed fair bulk and crimp and he suggested "An obvious improvement—use a windup roll to separate process zone from package zone."

The work of April 23, 1956, which the board considered to be a reduction to practice, was performed by Walston and is described on pages 104 and 105 of his notebook, in evidence as Exhibit 4. Concerning that work, Walston testified:

"Q21. What was the specific purpose of your doing the work which you did on April 23, 1956, and which is described on these pages 104 and 105? A. Well, Marty Sussman and Ferd Wetzel had already performed this operation, and it was my duty assigned me by Al Breen to improve upon it and make an improvement to condense the entire operation; and to do this I realized it was necessary to control the rate of overfeed, and by doing this I designed and built a brass roll that would fit over the draw roll of the RG draw-twisting machine which would give me a 15 per cent rate of overfeed.

"Q22. Did you make any other modifications? A. In this modification I added groves in the feed roll, which would be the brass draw roll, and these were put in to prevent the yarn from walking off the draw roll.

"I also had a snub roll to prevent the walking of the yarn.

"The jet was smaller and there was an improved heater, and also I added an 8 per cent step roll. This was placed on the front surface of another draw roll to give me a 23 per cent overfeed and a much better rate of control.

"Q23. What yarn did you use in running this process on April 23, 1956? A. This was an undrawn nylon yarn.

"Q24. At what speed were the feed rolls operated? A. The feed rolls were operated at approximately 30 to 34 yards a minute, I believe.

"Q25. At what speed were the draw rolls operated? A. At 103 yards a minute.

"Q26. At what draw ratio did you operate on April 23, 1956? A. The draw ratio was three and a half times.

"Q27. Referring to the sketch on page 105, at what location was the twist imparted to the yarn and distortion set in the yarn? A. The twist was set between the torque jet and the draw roll with the brass overfeed roll on it—from the jet up through the heated area, the slotted heater I had on there.

"Q28. At what speed was the yarn withdrawn from the twisting and setting zone? A. It was withdrawn at a much lower rate than it was put in from the overfeed roll or the brass roll. It was put in at a rate of 23 per cent overfeed. The yardage I don't believe I have here.

"Q29. At what temperature was the heater maintained? A. The heater was operated at 250 degrees Centigrade.

"Q30. How did you describe the yarn which was taken up? A. The yarn on the final package was very well heat-set, in a highly twisted state,[3] and bulk—voluminous, I think, is the better word."

Walston also compared the operation of the apparatus with the step roll which he used with the operation of the earlier apparatus including the pirn windup without the step roll, used in January by Sussman and Wetzel. He stated:

"* * * the step roll gives a more positive control of how the yarn was held or retained the degree of tension in the twisted zone and heated zone. With the pirn windup we had the traveler type method whereby the traveler or traversing board would in its motion to build up on the pirn rise and lower and would give you some degree of fluctuation in the yarn; and, consequently, as long as the tension was constant, why, we had a much improved product, a more uniform product."

In responding to an inquiry on redirect examination, Walston stated in characterizing a knitted fabric referred to in Exhibit 4:

"* * * we had a well-balanced yarn, which we found necessary for knitting, and with a high degree of shrinkage and a rather very uniform sample."

He also stated that measurement of shrinkage was a method used to determine the crimp in yarn "and the higher the shrinkage the better the product."

In holding Breen and Sussman had established reduction to practice on April 23, 1956, the board stated:

"* * * We are convinced that every step in the process set forth in the involved count was performed and we believe that the evidence by its preponderance establishes that the product was a heat-set, voluminous yarn, a uniform product, and a product having a desired high degree of shrinkage of demonstrated usefulness."

Consideration of the record in light of the briefs and arguments of the parties convinces us that the board did not err in that conclusion.

A principal argument of Willens is that the work of April 23, 1956 does not inure to the benefit of Sussman and Breen. He finds significance in the fact that the work was done by Walston and reported in Walston's notebook with Sussman signing as a witness and states that the record does not show the work was the suggestion of anyone other than Walston. However, it is clear from the record that the work of January 27, 1956 was in furtherance of the conception of Sussman and Breen. The board found that work involved the performance of

3. Cross-examination of Walston included the following:

"XQ41. I notice in your direct examination you referred to the yarn on the pirn as being in a highly twisted state. Would you care to reconsider that? I was of the opinion that it was of the order of magnitude of one or a half-turn per inch in that yarn. A. If I said highly twisted on the pirn that is a wrong statement. It was in a bulked state with a twist directional strain on it when it was heat-set."

every step set forth in the count and we agree. Sussman's notebook reporting that work suggests as "an obvious improvement," the "use of a windup roll to separate process zone from package zone," just what Walston did. In testimony quoted hereinabove, Walston acknowledged the previous work by Sussman and Wetzel and stated that Breen assigned him to improve upon that operation. We are convinced from the record that Walston's work of April 23, 1956 inured to the benefit of the party Breen and Sussman. Although Willens also discusses cases on third party inventorship the record is so plainly lacking in any support for a charge that Breen and Sussman were not the inventors that consideration of the law on that subject would be of little value.

Willens also advances an argument based on the fact that tension on the yarn was not measured during the April 23, 1956 operation although it was measured during the tests on January 27, 1956. On the apparent basis that the non-uniformity of the product of the latter tests resulted from variations in tension caused by the pirn take-up, he argues that tension measurements would have been required in the April 23 tests "to ensure elimination of the tension variation." However, uniform tension is not specified in the count and its absence in the first test was only pertinent as a possible reason for an absence of uniformity in the product. In the April operation, the variation in tension was eliminated by the insertion of a windup roll and, what is most important, the evidence shows that the yarn produced had uniformity and other qualities indicative of successful operation of the process. Although, as noted by Willens, a sample of the yarn was not introduced in evidence, the evidence that was submitted is convincing that the process was operated successfully, and no basis is seen for drawing any adverse implication from the absence of a sample.

Another argument of Willens is based on certain numerical values given in Exhibit 4 for the constants of the apparatus. He points out that the value noted on a sketch on page 105 of Walston's notebook for the speed of the overspeed roll does not equal the product of the values noted for the speed of the feed roll and the draw ratio. He associates that with the requirement in the count for collecting the yarn at a linear speed less than that at which it is fed into the false-twist zone. However, the testimony of Walston, quoted above, is that the yarn was withdrawn from the twisting and setting zone at a much lower rate than it was fed into the zone. Neither the noted value for speed of the overspeed roll nor the calculated value is inconsistent with the testimony which demonstrates that the limitation of the count referred to by Willens was met.

In connection with the same argument, Willens also refers to a statement said to be made on page 106 of Walston's notebook as indicating that "perhaps" a higher overspeed than referred to in Exhibit 4 should be used. We do not see that such a statement could possibly outweigh the evidence of successful operation of the process. What is perhaps even more important, page 106 of the Walston notebook was not introduced in evidence by either Breen and Sussman or Willens and cannot be considered.

It is also urged by Willens that Breen and Sussman have failed to establish that the work of April 23, 1956 actually resulted in "setting in the fibres of yarn the distortion imposed by" the "false-twist," as required by the count. He states that the term "setting" requires "the imparting of a substantial degree of permanence to the twisted configuration" and refers to a definition of "setting" as "stabilizing the twist in the yarn." [4] Although recognizing that "Walston did use the word 'set'," Willens states there is no evidence of the degree of permanence of the twist imparted to the yarn. He also compares the heater

4. Willens attributes that definition to J. J. Press' "Man-Made Textile Encyclopedia," 1959, page 989.

temperature of 250°C noted on the sketch of Exhibit 4 with heater temperatures mentioned in the Breen and Sussman application.

We do not find those arguments convincing. The Willens patent in which the count originated does not designate the temperatures to be used or specify a degree of permanence required for the yarn to be set. It apparently treated both of those factors as matters within the abilities of those skilled in the art. Walston had long experience with the du Pont Company, a pioneer in the field of synthetic fibers and particularly nylon which was used in the April 23, 1956 work, and was given responsibility indicating recognition of his experience and ability in experimental work. No sound basis is seen for doubting that the yarn he described as "well heat-set" was the result of "setting" of the type required by the count.

The last argument raised in Willens' brief is based on the statement that Breen and Sussman did not include the work done on April 23 as an example in their applications even though application serial No. 598,135 included 57 specific examples and the continuation-in-part application in interference raised the number of examples to 101. Willens argues that the above indicates that the April 23 work was not considered worthy of inclusion in the application. While the inclusion of the April 23 conditions as a specific example might have been some additional indication of the success of the operation, their omission does not detract from the already significant evidence of reduction to practice. Moreover, Breen and Sussman point out that one example in both their applications discloses the treatment of undrawn nylon under very similar conditions to those of the April 23 operation.

For the foregoing reasons, the decision of the Board of Patent Interferences is affirmed.

Affirmed.

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief