**Arvid C. WALBERG, Appellant,**

**v.**

**Richard O. PROBST, Appellee.**

**Patent Appeal No. 8772.**

United States Court of Customs and Patent Appeals.

March 8, 1973.

Penrose Lucas Albright, Arlington, Va., Mason, Albright & Stansbury, Chi-

cago, Ill., attorneys of record, for appellant.

David H. Badger, Greenwich, Conn., Richard R. Trexler, Richard S. Phillips, Chicago, Ill., attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to appellee Probst, the junior party. Probst is involved through his application serial No. 272,615, filed April 12, 1963.[1] Walberg is involved through application serial No. 471,965, filed July 14, 1965,[2] which is a division of application serial No. 254,899, filed January 30, 1963.

## The Invention

The invention relates to electrostatic-hydrostatic coating apparatus described in appellant's brief as follows:

> The invention involves an electrostatic spray painting device of a type which utilizes a high voltage (generally 50,000 to 100,000 volts) to charge atomized paint as or soon after it leaves the nozzle. Paint so charged tends to seek grounded objects, usually manufactured objects, which travel past the painting device on a conveyor. A relatively high percentage of the charged paint is attracted to the objects thus painted and, indeed, the attraction is such that much paint spray missing the objects is drawn back and thus both sides may be painted even though only one side faces the painting device. This is known as "wrap around." Until the instant invention, the atomization of the paint in such devices was generally accomplished either electrostatically or by air atomizing jets.[3]

\*　\*　\*　\*　\*　\*

Basically the invention is a hydrostatic (also referred to as "airless") spray gun with electrostatic charging means. The gun has an elongated body of insulating material. There is one passage through the elongated body for carrying paint to the spray gun's nozzle at pressures up to 3,000 psi and a second passage for carrying a high voltage (up to and over 100,000 volts) in an electric circuit to a charging electrode operatively associated with paint discharged from the orifice of the gun's nozzle. Both passages terminate near the forward end of the body. As set forth in the second count, a resistor is carried in the electrical passageway and both passages extend *longitudinally* through the body. The purpose of the resistor is to limit discharge from the charging electrode should it be accidentally grounded.

Two counts are in issue, count 1 reading as follows (paragraphing added):

> Apparatus for hydrostatic atomization and electrostatic deposition of coating material on a surface to be coated, comprising:
>
> an elongated body of insulating material having two passages therethrough, terminating adjacent the forward end thereof;
>
> means connecting one of said passages with a supply of liquid coating material under sufficient pressure to effect discharge of said material through an orifice for hydrostatic atomization;
>
> means for controlling the flow of coating material through said one passage;

---

1. Assigned to Ransburg Electro-Coating Corp.

2. Assigned to H. G. Fischer & Co.

3. Appellee points out that electrostatic-hydrostatic coating or spraying basically was known prior to the inventions of the present applications, directing attention to U. S. Patents No. 3,048,498 and 3,169,-883 and to a discussion of the development of the art in Ransburg Electro-Coating Corp. v. Nordson Corp., 293 F.Supp. 448 (N.D.Ill.1968).

circuit means in the other of said passages, connectable with a source of high potential;

first means mounted on said body, closing the other of said passages;

second means mounted on said body and extending across said one passage and including a surface defining the orifice in communication with said one passage;

a conductive charging electrode operably associated with the discharge from said orifice;

and further circuit means connecting said electrode through the circuit means in said other passage with said high potential source for electrostatically charging atomized particles of coating material discharged from said orifice.

Count 2 specifies that the "two passages" in the "body" extend "longitudinally therethrough" and are offset from the axis of the body and calls for "resistor means" in the other passage.

### The Board's Decision

The board considered evidence by both parties directed to showing conception and reduction to practice prior to their filing dates. It held that appellee's evidence showed that a spray gun built by Probst's assignee, Ransburg, embodying the limitations of count 1, was successfully operated as early as October 18, 1961, and thus proved reduction to practice of the invention of the count by that date. It found that evidence including a drawing introduced as Exhibit P-1 established conception of the invention of count 2 as early as July 13, 1961. The board further held that appellee's evidence was sufficient to establish a reduction to practice of a spray gun meeting both of the counts as early as April 25, 1962.

In arriving at the above holdings with respect to conception and reduction to practice by Probst, the board rejected a "contention of conflicting and confused evidence of conception" urged by Walberg "as not supported by the record."

It characterized Walberg's allegation as "akin to a contention of third party inventorship which is not entitled to consideration in an interference proceeding in accordance with a long line of decisions" citing Foster v. Antisdel, 14 App.D.C. 552, 1899 C.D. 413, and Huang v. Cheney, 362 F.2d 816, 53 CCPA 1355 (1966).

As to Walberg, the board held that the record established conception no earlier than January 27, 1962 and reduction to practice no earlier than June 26, 1962. With respect to claims by Walberg to earlier dates it stated:

5. The evidence of Walberg relating to the earlier models of spray guns in which the high voltage cable was:

(1) connected adjacent the forward end of the barrel (Exhibit W–"A"), (2) provided with a sleeve of insulating material loosely mounted on the handle of the gun, which sleeve * * * [was] taped to the paint tube to prevent the connection at the front end from breaking (Exhibit W–"H"), and (3) incorporated in a tube of insulating material detachably mounted adjacent the paint tube (Exhibit W–"P" and W–"Y1") [,] has presented us with the issue of whether or not such models meet the counts of the interference. The resolution of such issue requires the consideration of three kinds of electrical connections in which the insulation material for a high voltage wire or cable and the insulated shielding for such insulated cable is suggested by Walberg as forming a body with the like material of the device to which the cable is connected. The insulation of the wire connected to the forward portion of the gun in Exhibit W–"A" or the polyethylene tube welded to the insulation of the cable in Exhibit W–"H" appears no different than the insulation on a usual electrical connection and, therefore, does not in our opinion constitute with the paint tube an elongated body of insulating material having

two passages therethrough as required by the counts of the interferences [sic]. The insulating material of the other electrical cable wherein one end is securely attached with a metal clamp to the handle of the gun, as shown in Exhibit W–"P" and additionally provided with a slidable bracket of insulating material at its other end, as shown in Exhibit W–"Yl" is regarded as an electrical connection not unlike that shown in Exhibit W–"H", and consequently, is not considered to form with the paint barrel a body "having two passages therethrough", as claimed within the context of the disclosures of both parties. The guns shown in Exhibits W–"P" and W–"Y1", consequently, fail to support the counts of interference. The decisions cited by the senior party, obviously, do not postulate any collection or connection of parts to be a body and hence we are not persuaded to hold that the insulating material surrounding the electrical cables referred to above cooperates with the insulating material of the paint tube to form the body having the two passages therethrough as required by the counts of interference; the cooperation so urged we believe was presented as an afterthought on the part of Walberg. Walberg's doubts as to the soundness of such urging is reflected in both the offer to dig up some firm data on one-piece construction (last paragraph, Exhibit W–"RR1"), and his earlier statement in the penultimate paragraph of page 5 of Exhibit W–"TT2" that "In our older design, the high voltage cable was separate from the gun."

## Opinion

### 1. Appellant's Date of Invention

Appellant does not rely here on the guns referred to by the board as items (1) and (2) in the above quotation. He contends rather that the gun (or guns) referred to in item (3), which he designates the "DB-gun" ("DB" standing for "double barrel") meets the terms of the counts and was successfully tested and reduced to practice on or before September 7, 1961." Since the board based its rejection of the DB gun as a reduction to practice on the holding that the structure of that gun does not comply with the counts without specific consideration of the tests of the gun, the question of compliance with the counts is the determinative question before us for review. More specifically, the issue is whether the DB gun, comprising spaced plastic tubes attached at front and rear and forming separate passages, meets the requirement for "an elongated body of insulating material having two passages therethrough" in count 1 and the corresponding more limited recitations in count 2.

Both parties' applications disclose paint guns in which two parallel longitudinal passages for the coating material and the high potential electrical circuit are formed in a forwardly extending body of plastic material. The front of the coating material passage ends in an orifice that atomizes the material as it passes therethrough and a charging electrode associated with the orifice is energized from the electrical circuit in the other passage. In the Probst structure connection of the electrical circuit to a high potential source is made through a handle attached at the rear end of the insulating body and the passage for the coating material communicates with a source of material through a fitting located just in front of the handle. In the Walberg structure, the handle is formed integrally with the body forming the barrel portion and communication of both passages to their supply sources is through the handle.

On the other hand, the DB gun was doubled barreled as noted.[4] It gave the

4. Appellee points out that the record does not contain a contemporary drawing of the "DB" gun under consideration. We have found it unnecessary to rule on the deficiencies alleged to exist in appellant's evidence concerning the structure of that gun.

appearance of a paint gun provided with the usual handle, to which a tubular electrical device has been attached. The tube or barrel portion containing the cable or circuit was spaced slightly from, and parallel to, the paint gun barrel. An electrical connection between the barrels was made at the nozzle end of the paint gun barrel through what appears to be a small spacing tube. The barrels were connected at the other end by means of a narrow clamp member. A fitting for engagement with a paint supply line communicated with the barrel of the paint gun portion. A cable for connecting a potential source to the conducting means in the other barrel extended from the rear end of that barrel unsupported by the paint gun portion or its handle.

▇▇ Appellant contends that the word "body" has such broad connotation that the DB gun, with its two tubular barrels attached together in spaced side-by-side relationship meets the claim limitation to "an elongated body of insulated material having two passages therethrough." He cites a definition of "body" in the broad sense as "the main central or principal part of anything as distinguished from subordinate parts, such as the extremities, branches, wings, etc."[5] He also refers to broad interpretations in prior cases, e. g., Ex parte Clark, 97 USPQ 165 (Bd.Appls. 1952), as indicating that a "body" need not be a single piece. He further observes that an interference counts should ordinarily be given the broadest interpretation that it will reasonably support, citing Mahan v. Doumani, 333 F.2d 896, 51 CCPA 1516 (1954). Appellant argues alternatively that, even if the word "body" is considered ambiguous as used in the counts, it should be interpreted in such a manner that the counts read on the DB gun. In support, he refers both to the use of "body" to describe other elements in the Probst application, in which the counts originated, and to arguments

made during the prosecution of that application.

We accept the broad definitions which appellant cites and agree with the general propositions of law on which he relies. But, giving the word "body" the broadest interpretation that it will reasonably support, we are not persuaded that there is any error in the board's finding that DB gun did not include a "body" having passages as recited. That gun comprises two basically separate elements, the paint gun and the electrical-potential-providing means, attached to one another in horizontal spaced relationship. While the elements were operatively associated through the electrical connection at the front end, the spacing between the two was substantial and the attachment between them was by narrow means that were widely spaced at opposite ends of the barrels. The barrels thus constituted two distinct members despite the attachment. They cannot reasonably be designated as one "body" nor could the two passages therein be regarded as in the same part or "body." Moreover, consideration of the points appellant makes with regard to the Probst application and its file history reveals no reason for reaching a different conclusion.

### 2. Alleged Third-Party Inventorship

▇▇ Appellant charges that the preponderance of the evidence establishes that Williams, a witness who had been a design engineer for Ransburg at the time of the development, "is the actual inventor in this case or that it was, at best, a joint invention in which Mr. Probst participated." Appellant's principal point is that if Williams was a joint inventor, his testimony cannot be relied on for corroboration.

The board stated:

The conception of conflicting and confused evidence of conception urged by Walberg is not considered to be supported by the record inasmuch as the invention of the count does not appear

---

5. Attributed to The Webster Encyclopedia Dictionary of the English Language (1963).

to be attributed to or claimed by anyone other than Probst. Probst obviously has been considered by Ransburg, the assignee, as the inventor. We think that the board was plainly correct in holding that Walberg's charge is not supported by the record.

Probst testified unequivocally that he was the inventor of the subject matter of the count. He also testified that the gun shown in Exhibit P–1 found to have constituted a reduction to practice of count 2, was his conception. Although Williams drew Exhibit P–1, he testified that he "always looked to Probst as the project engineer" for the Ransburg gun and stated that he "was instructed to" draw the gun. The record here is completely lacking in evidentiary support for either a contention that Williams was a joint inventor or that the work of Williams does not inure to the benefit of Probst. See Willens v. Breen, 343 F.2d 477, 52 CCPA 1210 (1965); Applegate v. Scherer, 332 F.2d 571, 51 CCPA 1416 (1964).

■ The decision of the board is affirmed.

Affirmed.